## Case No. 540.

### The ARMSTRONG.

[1 Brown, Adm. 130.][1]

District Court, E. D. Michigan.   May, 1866.[2]

NEGLIGENT TOWAGE—EQUIPMENT OF TUGS—LOOK-OUT—INEVITABLE ACCIDENT.

1. A tug, whose master also acts as pilot and engineer, is not properly manned.

[Cited in The Coleman and Foster, Case No. 2,981.]

2. It is the duty of a tug towing a vessel through a narrow channel and encountering a snow storm so heavy as to obscure the sight, at once to stop and cast anchor.

3. The want of a competent lookout is a fault of the grossest description.

[Cited in The Steamer Ancon, Case No. 348.]

4. The opinion of the master and crew of a tug, that their vessel was properly managed, and that the accident was inevitable, is entitled to very little if any weight.

In admiralty. Libel for damages occasioned by negligent towage. The libellant, the owner of the schooner Swallow, brought his action to recover damages for careless and reckless towage across the St. Clair Flats in December, 1866. By the contract set forth in the pleadings and proofs, the tug agreed to tow the schooner safely from Algonac to New Baltimore, a distance of only 14 miles, employing competent power, skill, experience, and a knowledge of the channel, for such an undertaking at that season, and with the vessel as she then was. The tug ran her aground, a few hours after she had taken

---

[1][Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

[2][Affirmed by an unreported decree of the circuit court.]

her in charge, on the morning of the 7th of December, and the libel alleges fault in the reckless and ignorant towage of the respondent. The answer admits the grounding of the schooner, denies that it was the fault of the tug, but alleges that it was the mismanagement of the master of the schooner, after and while the tug was aground. It appeared in evidence that the master of the tug also acted as pilot and engineer, and the mate was also serving in the capacity of wheelsman. [This case was affirmed by the circuit court, but the circuit court decree has not been reported.]

J. S. Newberry, for libellant.

W. A. Moore, for claimant.

WILKINS, District Judge. From the answer the important fact is elicited that the tug ran out of the channel and got aground, and in consequence, the schooner, being attached to the tug, was also grounded, and in the hurry and confusion of such an incident, neglected to detach the line or to cast out an anchor. Neither of these allegations, if clearly proved, would exonerate the tug —because, 1st, the captain of the tug knew the condition of the schooner before he made the contract, as to her active force in case of such an emergency; and, 2d, if his ignorance and incompetency ran the tug aground, he is not excused from responsibility as to the schooner, by her neglect to detach herself immediately from the tug, or stop her own progress by casting anchor. The contract was safely to tow her through the channel for 14 miles, under her then existing condition as to her crew and power of self-control; and it was the grounding of the tug that rendered such other but then unavailable help necessary for her safety. This defense is, therefore, dismissed from consideration.

The business of towage is one of great importance in navigation, and, both in England and in this country, is governed by rules of justice and common sense as certain as those which regulate any other business. Experience and skill are implied in most contracts for work and labor to be performed. A carpenter is not a blacksmith, a tailor is not a lawyer or a physician, neither is a farmer a steam navigator. Holding one's self out as such, against the fact, is a fraud; and, where it embraces the skillful care of property and life upon the water, the fraud amounts to a crime. My mind was strongly impressed during the hearing, that the father and brothers, who owned and had the control of this tug, had not the necessary experience as sailors to warrant them in entering into such a contract; and, though their presence on the witness stand was prepossessing and inviting of confidence, I could not give to their testimony that reliance which would lead to an acquittal from great blame. They ventured the Pass without sounding line or small boat, to feel their way, beset with obstructions, with no other instrumentality but a small pole to exhibit depth of water as they progressed, through a hazardous channel, and at the season of peril. The posts of duty were not sufficiently manned; three persons undertaking the duties at one and the same time, of master, engineer, wheelsman, and lookout, and the master, working the engine one moment, and then hastening to the bow to look ahead and about for the channel. Neither can I determine the case in their favor on their testimony as experts. Their opinion, as to the correct management of their boat, should not be and is not reliable. They swear the blame away from themselves, and attribute it to the act of God, as an unavoidable accident—the result of a blinding snow storm.

Until the act of congress of 1864, [13 Stat. 351, § 3, and page 533, c. 113,] forbidding the exclusion of interested witnesses in civil actions, I had resisted the adoption of the state practice, admitting such as competent, and clinging to the old common law rule as the safest and wisest. When such testimony is offered to a jury, the court has nothing to say, but, as the credibility of witnesses in admiralty is a question for the court, I frankly declare that I will give to such testimony very little confidence, and, more especially where it is but the mere opinion of the witness—under oath, it is true, but a swearing away of personal liability. The yarn spun by sailors, assuming the solemn dignity of testimony, must always be received with caution, and scrupulously sifted, however carefully woven. Sailors will, from habit, compare notes with each other, and where there is a minute exactitude of agreement in narrative, it will lead to suspicion. But the Armstrong brothers and their father were not educated seamen, or so far experienced in the business as to justify the rejection of their statement, simply on that ground. Their concurrent opinion, however, is open to a different objection.

With honorable men—and I know nothing to the contrary but what this father and these brothers are such—interest will not lead to the manufacture of falsehood, or the suppression of truth; but, in ninety-nine cases out of one hundred, such a relation to the case obscures the judgment, and generates mistake. The question of fact is, whether or not the incident was an unavoidable accident, the snow drift blinding the vision of the tug's master and wheelsman, and their judgment that it was so cannot safely be made by the court the basis of its decree in their favor. The occurrence was either an unavoidable accident or the fault was in the tug. The proof exonerates the Swallow. She was to follow, not to lead the tug. The tug first ran out of the channel, and then aground. This caused the Swallow to swing and get aground. Had the tug kept the channel, neither the tug nor schooner

would have got aground. This is clear. But whether she ought to have cast her anchor after the tug was aground, does not affect the question of blame. It is not probable that it would have prevented her grounding; she had not a competent crew to do it, and this the tug's captain well knew when he entered into the contract to tow her through the channel, only 14 miles, in daylight. There was no fault in the Swallow, and her swinging to and fro in this narrow channel, and running into the bank, was caused by her tug pilot running herself ashore. Was it an unavoidable accident? This would excuse. Man is not held responsible for the act of God. But the proof of this must be clear, direct and unquestionable. There was a snow storm while the vessels were in the channel. If it was such as to blind the vision, it was the duty of the tug to stop and await its abatement. Was such the conduct of the captain? He swears, on folio 95: "I did not stop entirely, because I wanted to preserve steerage-way until it cleared up," and "I ran about ten minutes after the snow storm had set in, and did not sing out to stop until my father, by a pole, discovered that we were out of the channel, and the schooner in danger." If, then, the storm was such as they describe, anchorage or stopping the engine was an imperative duty. Ten minutes' run, or a mile, under such circumstances, was imperiling the safety of the schooner, and a gross fault on the part of the tug. The appellate court, in the case of The Morton. [Case No. 9,864,] emphatically establishes the rule, that under such incidents the duty of the tug is forthwith to resort to other measures of precaution and prudence to protect her tow, either by slowing, stopping, or sounding. "The tug," says Mr. Justice Swayne, "has no right to dash blindly on, and incur danger she neither knows nor can avoid." If danger threatens, to stop at once is her duty. Where the vision is obscured, in the navigation of a narrow channel, there is imminent danger, and to continue the course, and not stop, is such negligence as makes the tug responsible for the consequences. The alleged storm cannot protect them; their own folly condemns, and that is not inevitable which can, by common prudence, be avoided.

Although sufficient reason is adduced, in the foregoing considerations, for the rendition of a decree for the libellant, I deem it proper to remark, as an admonition to tug masters, that this and the appellate court have determined that, if the catastrophe in these cases can be at all attributed to the want of a proper lookout, such destitution will of itself render the tug liable. Such is the law in this district, and governing the navigation of these contiguous lakes. It is idle to say that the business will not warrant the expense, or that the captain and wheelsman can, on these boats, keep up a sufficient lookout. Recent exposition of the law de-

clares otherwise; and tugs, engaged in towing most of the time property only, are as much required to have competent lookouts as larger steamers, intrusted with the care of human life. A lookout is a functionary in navigation, with duties distinct from the captain, or mate, or wheelsman, and neither of the latter class can supply his place and attend properly to his own specific charge. As well might the captain work the engine, or the engineer manage the wheel, as either engineer or captain keep up a constant, vigilant lookout. It is true, life is more precious than property, and its protection ranks higher in the law, but admiralty makes no preference in administration, and casts its ample aegis over both.

In The John Fretter. [Case No. 7,342.] Judge Swayne says: "Where there is no lookout, the fault is of the grossest character. and every doubt relating to the consequences is to be resolved against the tug. It is impossible, in the nature of things, that the captain can perform properly his other duties and also that of the 'lookout,' and he must not attempt it. A crew is not competent without a lookout, either on tugs or steamers. If there be none, the tug cannot avoid her responsibility by the oaths of the captain or crew, if there be the slightest doubt as to the spring-head of the catastrophe." Such is the strong language of the appellate court, and I am sure, as now constituted, will never be modified. Of this our tug-owners may be certain. If the damage accruing can by possibility be attributed to this cause, the essential allegation of a competent crew is disproved, and the oaths of the captain and crew will be received with suspicion.

The proofs in this case establish the fact that the mismanagement of the tug and the ignorance of the channel caused the libellant's vessel to run ashore, and a competent lookout, acquainted with the channel and its banks, might have avoided this grounding, notwithstanding the alleged storm. Piloting a vessel through a narrow channel, although for a short distance, in stormy weather, demands a full crew—master, lookout, wheelsman and engineer—each of whom shall be at their posts; and the lookout cannot be dispensed with, and is as essential to avoid collision with natural obstructions as with other vessels.

Collating, then, in a condensed form, the answer and the reliable proofs, the following facts are prominent, incontestable and conclusive: 1. The Armstrong, having the Swallow in tow, first got out of the channel, and first ran aground. 2. The contract was for safe towage, and implied a knowledge of the channel, of the condition of the schooner, and the shifting peril of the weather. 3. There was not sufficient time to detach the tow, or to cast anchor, so as to secure the schooner in the channel. 4. To detach the schooner, by cutting her tow-line, would have, from the narrowness of the

channel, and the ignorance of her captain of its banks and breadth, most certainly have run her ashore. 5. The tug continued her course for some minutes after the snow storm had commenced. 6. Instantly stopping might have avoided the catastrophe. 7. The crew of the Armstrong was incompetent for the peril encountered, either for safety or extrication. The grounding of the tug proximately occasioned the grounding of her tow, and if the first could have been avoided by ordinary care and forecast, the proximate was not overruled by any paramount power. If the storm was foreseen, and its peril could have been avoided, the responsibility is with the tug, and cannot properly be ascribed to "a blinding snow storm."

Decree for libellant.

NOTE. [from original report.] Upon appeal to the circuit court, the decree in this case was affirmed.